Good morning, Council. We'll go ahead and call our first case, Allen v. Ollie's Bargain Outlet. Good morning. May it please the Court, Rick Eder, on behalf of Appellant Ollie's Bargain Outlet, Inc., I would like to reserve three minutes for rebuttal. Done. I plan to start with commonality unless the Court has another issue they'd like me to address first. I've got plenty of questions about numerosity, too, but you start where you want. The District Court here erred in finding that there's a common question of law or fact. The District Court, as you know, identified a single common question, and that's whether Ollie's policies and procedures caused access barriers in interior paths of travel. As an initial matter, it's not a violation of Title III to place obstacles in paths of travel. But they say you put out this VSS and that that nationwide policy encouraged what's happening, and that's a common question subject to common proof. What's wrong with that argument? What's wrong with that argument, the initial matter, is that there is no uniform policy or any provisions, whether in the text or in the photographs of the visual store standards, that suggest that items should be placed in aisles. There's a lot of wordplay in the briefing, but if you look at the actual VSS themselves… …and specifically have a photograph and say, like, do it like this, and in a way that does narrow aisles… It does not actually say that. There are photographs, it is true, of end caps that… I grant you it doesn't say, and narrow the aisles, but it's a necessary result of saying, hey, have these end caps, have these side displays, to actually narrow the aisles. I would say it doesn't say that they should even have end caps. In fact, the visual store standards are quite explicit that they state to the store managers, you are going to determine the locations of the products and product displays. These standards, as the name suggests, are simply telling you, if you choose to use certain types, this is how they should appear, the visual store standards. But the policy also requires that those store managers adhere to the standards that are set out there, and they include the maximization of use of space with some specifics, like with the Christmas displays that are supposed to be staying out, and those use of end caps and side wings. So, why should we say, just because there are instances where that encouragement in the policy results in lawful barriers, that the allegation, at least, that the policies also result in unlawful barriers, doesn't present a common question? This case, I think, is similar to Hoheider versus the UPS case. So, the situation here is that that issue isn't going to resolve a question of liability as to the class, because the elements, as the court failed to even analyze, but the parties agree in their briefing, the elements to establish a claim here are, one, that the individuals are disabled within the meaning of the ADA, two, that there is an accommodation that owns and leases, which isn't an issue here, obviously, and then the third, that the defendant discriminated against the individual by denying them full and equal opportunity and access. So, the gravamen of the claim is that there's a denial of access. So, the idea that they're simply putting out something in an aisle that is a potential access barrier, and remember, we're talking about architectural barriers. Although it's not defined in the act, as this court said in Mielo, that that term, citing to the guidance from the Department of Justice, architectural barriers are physical features that limit or prevent people with disabilities from obtaining the goods and services that are offered. So, that's what's ultimately going to be a question here. So, just like in Hoheider, the fact that there is, if you refuse to engage in the interactive process, you might put yourself at more risk that you'll ultimately have a violation. Mr. Edder, are there other ways, what are the other ways, in your view, that a store can avoid ADA liability, can provide access, if there is a narrowing of the aisles? Assume for just the sake of discussion here for a moment that we thought, oh, these side displays and end caps, that's problematic. You said a minute ago, well, that's not the end of the issue. Are there alternative ways that are within the regulatory regime that are permissible? Absolutely. There's a number of factors that you have to analyze, which the court failed to here, as they noted in one of their footnotes. And so, one of them is, so the question is, is it readily achievable, right? And so, readily achievable is defined in the regulations, easily accomplished, and able to be carried out without much difficulty or expense. If these are temporary displays, why isn't it easily achievable to move them? Well, and that's a great point. So, that's why there's an even more specific section of the regulation that says, as to temporary or movable structures, such as furniture, equipment, and display racks, they're not readily achievable to the extent that it results in a significant loss of selling or serving space. So, you're going to have to have a store-by-store analysis here. And their very contention is that, hey, OLLI's policy and practice of maximizing store space and putting as much on the floor as possible, that's the issue here. Well, the regulation says, well, if you go against that and take that away from them, then it's not readily achievable, in which case what you need to do is make sure that there's some other way that the individuals can get the products. And OLLI's has a policy, as you saw in the record, of providing access, having associates go and get products whenever somebody can't access, which both plaintiffs testified. Isn't that yes, I can policy, isn't that applicable when somebody asks for it? Absolutely. And is this correct? Is that a problem? I mean, I ask whether that's a problem. Is it enough to say, hey, if you need it and you tell us, we'll get it to you? Or is that adequate access under the regulatory regime? It would be adequate access because, you know, we're talking about it's failure to remove. That's the requirement here. And as this court said in Mielo, there's not an affirmative obligation to identify even existing barriers, much less potential barriers up front. So the obligation is once it's brought to the accommodation's attention, that they make whatever adjustments or make it accessible. More, let me, we're winding down, and I do want to get to numerosity if I can. I don't want to cut off even my colleagues have commonality issues, questions they want to ask. I guess I'd like to understand why, you know, you have been focused on Dukes and Mielo and the suggestion that commonality is not satisfied there because it's not enough for a violation of a provision. But what's been alleged here is far more narrow than that. Why do you think Mielo and Dukes are prohibitive of finding commonality, where we have a very different type of allegation here? Sure. And Mielo, I think the focus for us was on numerosity more so than that. So I think Hoheider and Ferreris are the better cases with respect to commonality here. But for the Dukes provision, so at the district court level, the argument that plaintiffs made was different than the one they're making now, and it was essentially you don't have enough control over your store managers and such, that they have too much discretion, so your policy doesn't function as it's supposed to, which is exactly the Dukes situation, right? I mean, the court says that that presence of discretion removes the idea that there could be some common, uniform practice at issue. And so that's why Dukes is at point. And just if I could add one quick thing before we move on to numerosity, is that the plaintiff's own testimony shows that this narrowing issue cannot be established on a class-wide basis. One of them testified that they could get through 27-inch-wide aisles, and the other testified that they could get through 30-inch aisles. So, again, the question is ultimately are you denied access? Right. So on numerosity, in Mielo we said that, look, meeting the numerosity hurdle is not supposed to be a Herculean task. And in this case, there was the use of the census data. And we also say, you know, census data plus something. I take their argument to be we've given carefully crafted census data. We've said who's got mobility issues within the zip code where an Ollie's is. And there's tens of thousands of them in many, many areas. And then our something more is, look, we know that there are disabled, wheelchair-bound people in these Ollie's stores because we've got photographic video evidence of it, and we've got actual complaints made from around the country. So when they say we've satisfied the something more, why don't you just take a moment and first deal with the census data itself. Why isn't that crafted enough for us to be able to comfortably say, well, out of tens of thousands in each zip code, there's probably, when you look across the country, at least 40, if we take that. We could probably guess, yeah, there's 40 out there. Sure. And then if we had to look at something more, why isn't the something more the things they pointed to? So if I might, for a second, back up and look at Marcus versus BMW, which is what Mielo relied on in discussing. You have to look at what the class definition is, and then you have to present evidence, plaintiffs have to present evidence that creates a reasonable inference that individuals meet the class definition. Here, there's three prongs to the class definition, as plaintiffs themselves proposed. And that's that the individual has a mobility disability, that they attempted to access an OLLI store, and that they will have experience or will experience access barriers in interior passive travel. So it's a much different and more complex class definition than was even at issue in Mielo. Also, in Mielo, you're dealing with parking lots that are an ongoing. So in that case, anyone. That's true. That's true. But I want you to focus on this case. Don't talk to me about Mielo again, because I'm wondering about tens of thousands. I don't see you attacking their census data and saying that is inaccurate data. So if there's tens of thousands of people with mobility disabilities, why isn't a logical inference that across the whole country, there's at least 40 of them that have shown up in an OLLI and found something challenging? Getting back to the definition, Your Honor, that's not the question, right? So they're still not class members. Those 40 individuals still need to experience an access barrier that denies them access. Just going into an OLLI store, it doesn't get you there, which is exactly what the court said. That's not enough for a reasonable inference. That's what Mielo said. I probably didn't say it right. My last point was meant to capture that, that they ran into some barrier. There's no way that that's not just speculation. I mean, it doesn't matter how large the numbers are. You're speculating that they ran into that. Now, there are complaints here. There's e-mails that we have. Take all of them, and you saw our arguments of why some of them should be excluded. But I'll take all 12 of them, put them in with the two named plaintiffs, even though Mr. Mullen himself said he never even had an access barrier himself. But we'll put those in. You have 14 individuals. That's not enough under the established law to meet the requirement of numerosity. That's to say that joinder is impracticable. And I will say also we did attack the idea of the census statistics on a different basis, meaning that they're not what plaintiffs say they are. You know, they're just information where anyone over the age of five said they have difficulty walking stairs. That doesn't mean someone's disabled within the meaning of the act or within the definition. Gotcha. Thank you. All right. Thank you, Mr. Mullen. Can you talk to us about consumer complaints as hearsay? Why should we think about it as hearsay when, I mean, first of all, haven't we already crossed that bridge in looking at those sorts of complaints before? But also, are we looking at it really for the truth or just for the fact that there are folks coming forward and saying I have this disability and I've had this experience? Why doesn't that go to belief and potential members of the class rather than the actual truth of the content? I would say, Your Honor, that Miele and Marcus versus BMW state that the plaintiffs have to put forth actual evidence that there's individuals who meet the definition of the class. And so the way they structured the class definition, that wouldn't be enough. They have to show that they actually experienced an access barrier, that they have a disability. And so the only way to do that is based on to offer that as the truth of what they're saying, that yes, in fact, I am disabled, and yes, I was at an Ali store and experienced the barrier. So they are offering it for the truth. I mean, that's what they have to do to meet their obligation. When we're looking to establish numerosity, we don't require every potential class member to come forward and provide medical data and evidentiary proof that they fit the definition. Why isn't it enough to have them identify what they have here and use that for purposes of numerosity? And the argument is that the rules of evidence should apply equally, obviously, as we had briefed, to class certification issues. And if that's the case, then it's hearsay. And they didn't raise an objection. I mean, they didn't respond to that and challenge that it wasn't hearsay other than to say it's not offered for the truth. But, of course, it is. I mean, it's offered to show they experienced an access barrier, which is what they have to show to be part of the class. I guess I'm wondering why we should take from the application of DALBERT as a reliability standard for experts. We should infer from that that the rules of evidence should apply wholesale to any type of evidence at the class certification stage, at this very early stage proceedings. The argument is less that following the DALBERT standard that that needs to also apply, but it's what is the rationale for excluding some rules of evidence at this stage, particularly given the heightened standard and the requirement that we prove each element with actual evidence and the fact that other circuits, as we have mentioned, actually do require admissible evidence to support class certification decisions. Even blood reagents wasn't based on Rule 702. It's a concept of reliability. Don't we have that with just a basic standard for, say, authentication? Well, plants could have made an argument with respect to hearsay and whether or not those kind of things were at issue here or those kind of safeguards were in place, but that argument wasn't made. So, you know, I didn't prepare to address it. But there could be situations, of course, where the rules of evidence provide other safeguards. That would equally apply here like it does in any proceeding. Okay. Thank you. Thank you. Thank you, Mr. Editor. Good morning. I'm Jameson Edsel for the appellees. And may it please the Court, I'll start with commonality. We have here what was missing in Dukes, which is central control from the corporate level. We have a policy. It tells store managers how to display inventory. Can you point us to what specifically in the policy you say is discriminatory or having this discriminatory effect? Sure. So it's definitely an accumulation of multiple things. One of them is the concept of bulking out as much as possible. And what is wrong with bulking out as much as possible? As much as possible is within the law. Sure. If it were, if the on-the-ground result was that it was always within the law, it wouldn't be a violation on its own. The problem is the result that is observed. We've collected representative evidence that shows the actual result. We've seen your evidence, but the question that you're being asked and that I'll put to you, too, is how does it flow from the corporate policy? The fact that they say we want you to maximize the use of the floor space, how does that turn into a corporate policy that discriminates? So one illustration of how to maximize the use of floor space is the use of side stacks. I'd never heard of side stacks before until I read it in the VSS. You see pictures of large cardboard boxes next to end caps. So by definition, the use of a side stack will protrude into an aisle. And does it necessarily protrude in a way that will cause an ADA violation? Well, I would say, you know, you go to a store that starts out with wider aisles, like maybe Home Depot or a familiar store with very wide aisles. If they use a side stack there, it's not going to narrow the passageway to less than 36 inches. But the reality is that all these stores are designed in such a way that their aisles are not that wide. So once they start using side stacks... So your position is there's no side stack that could exist that wouldn't be an ADA violation? No, no, no. I don't want to go that far. That's not our position. And if you're not prepared to go that far, then how does the policy create a nationwide problem? Because we show the results on the ground. We collect evidence of how it actually is used in place and what the result is. So we use representative evidence. We get it enough to be fairly representative of what is happening at the stores. And it shows the result, and the result is a violation. But if the maximization of use of space is not itself violative given the size of their aisles to begin with, and per se the use of these end caps were at the side wings, then why aren't we looking at store manager discretion and that clearly not being sufficient? Well, so we're starting with these corporate directives, which is maximize use of force space. Here are some ways to do that. And then what we have is a lot of evidence that shows the results. So what we would do after class certification, there is more to the case, and part of that case is our proof that the policy does in fact lead to violations. There's a direct through line. Wait, wait. Let me make sure I understand. Your position is that you can establish the link between the policy and violations after your class is certified, but you don't have to do it before the class is certified. I think that's fair. What we do have to show is that it's plausible. It is a plausible link. It's not just here's a policy that says nothing about how to put merchandise anywhere, and we say, well, there's a common policy. Then I think that would fail like the test under Dukes. It's not a contention that once it's resolved will actually drive the resolution of the litigation. But here, if we show that the encouragement or the mandate even to maximize use of force space and the use of side stacks does tend to lead to violations. I mean, in the visual store standards, doesn't it say and say explicitly, these are things you can do, but it's going to be up to you to figure out how best to use the space and drive sales in an appropriate way. So delegating some amount of discretion to store managers I don't think is enough to defeat commonality here when the result is a pattern. It's an observable pattern. It's an objectively measurable pattern, and it's repeated company-wide. So we can show that, yes, they're given some discretion, but the results are always basically the same, which is aisles of the two now. So let's look at what you're presenting in terms of that pattern nationwide. Because we have, on the one hand, the standard of Dukes. If what we've got is 120 of these instances, and we're talking about a group of over a million, we're talking about there are a few states, that's not sufficient. Here we have, if we take the complaints, if we take the specific instances you've given us, maybe 30, and we're looking at just Pennsylvania, where are you giving us the pattern of a nationwide effect of this policy? Well, I think that sort of goes to the question of how much representative proof do you need. If we had to go to every single store and document every single violation in order to have a class action, we wouldn't really have a class action. We would just have a huge case where, rather than utilizing the efficiencies of Rule 23, we're actually just litigating a million claims at one time. Isn't that exactly the point? That's their point. The point is, to do this fairly, it's all going to be so different. This is Dukes. You can't say, hey, they gave you some pictures, and therefore you can conclude that in the over 300 Ali stores there are problems, and that they're permanent, and that they, in fact, impede people from getting our goods and services. You would have to go into every store, you'd have to look at every store, and you'd have to ask the people, can your wheelchair fit through there? Can your wheelchair fit through there? Is this a temporary thing that can be moved easily? Does the yes, I can policy provide for somebody to go get you the thing you want, and that's adequate? You'd have to do all that, and that's not common. That's the argument you've got to answer. Right. Well, and I think the way we do that is by showing that the policy will have an expected result, and it has an observable result, and it's happening so much that there's not a, the explanation is not this is 350 managers that are all coincidentally putting side sacks that protrude into the aisles. When you say 350, I mean, that's assuming something that's not in front of us. You've got pictures from some stores, but you don't have 350 stores, and that's their point. It's not going to be the same in every store, and we have a policy which explicitly gives the store managers the opportunity and the responsibility to do this the right way, and if some people are doing it the wrong way, that doesn't mean we from Central did it to them. Well, Central, the company, the company is the defendant. It's the company's obligation to make sure they're complying with the ADA, and if their managers are consistently failing to do that, and we've identified the plausible cause, which are the instructions that corporate is giving to the managers, that is the link. That is the commonality. The problem is the root. It's the company's directives. It's not managerial discretion that just happens by accident to lead to this result. It's the anticipated result. It's what we would expect to see when managers are told maximize use of floor space, use side stacks, bulk out things, drop pallets. Like when we see that on the ground in 10% of their stores, they all have aisles that are too narrow. I think the causal connection is there. There's enough proof there. If you can't point us to the specific thing in the policy that you say is having this effect, what do we do about cohesiveness? What is the resolution that would resolve this for the entire class? It's not really that difficult. We could say, because as Judge Ordon asked earlier, like you're not saying that all side stacks are necessarily going to violate the ADA. Okay, no, but if we add a sentence to the VSS and it says, if you're going to use a side stack, walk through the yardstick and make sure there's 36 inches there at the aisle. That's all you have to do when you're putting it down. If we get them to modify their policy in that way, we will have achieved a result that inures to the benefit of the entire class. That's cohesiveness right there. And there are specific types of changes you can make to that national policy that will reduce. If they put that in their policy manual today, would that move this case? Well, we'd have to make sure that they're actually doing it. They're actually removing the barriers as well. You can't just change the piece of paper if you're not actually changing the physical manifestations that are causing the inaccessibility. Is even that required given the regulations as to the use of the temporary displays and the yes I can policy? I mean, putting in there that it's got to be 36 inches measured across, that covers more than is actually required, right? I want to clarify that the complaint and the conduct we're talking about is not temporary and isolated obstructions. It's intentionally placed merchandise. And the evidence shows intentionally placed merchandise. It's necessarily temporary, right? These are not bolted in the ground. These are temporary displays. So when we use the term temporary and isolated, the regulations are specific that that means if it's there for a purpose such as maintenance, such as restocking, not to be sold from the floor, but the purpose of like an employee, if they have a pallet and they're taking the boxes and they're putting them onto the shelves, that's a temporary obstruction. But if it's there for purposes of sale, it's not temporary. Okay. Let's move to numerosity. Well, first, let's pick up with where things sort of ended with Mr. Etter. Assume, and we'll talk about this in a second more, but assume for discussion for just a moment that we thought admissible evidence is necessary. You've said that the complaints are not offered for the truth of the matter. And I'm just having a hard time getting my head around that. The whole point is to say, here's a person who's had a problem because they said so. Why isn't that exactly the truth of the matter? So, because we're not proving the merits right now. We're proving how many people are subject to the practice. Yeah. And to prove how many people are subject to the practice, you have to have somebody come forward and say, I had a problem. And I had a problem. Is it the truth of the matter? Is there any other reason to point to that except for you want us to believe they had a problem? I think it's the fact that they are making that contention. That counts them. So, they could be untruthful. Sure, they could be untruthful. But you want us to believe that they're true. No, we just want to show that they exist. They are there. They're making the same type of claim. There you go. They're making the same type of claim. That is the truth of the matter, isn't it? I don't think so. I think the truth of the matter is that what they're saying is truthful. I think you're going to the merits. It's a question, do they have a proven claim? No, no, no. That's not the merits. That's a straight-up evidentiary question, Mr. Edsel. If somebody comes in and says, look, this is my contention. Oh, what is it? And if you accept my contention, then it is proof of the thing I'm attempting to prove. There's no other thing being attempted to prove. This isn't like it's an excited utterance or this is a dying declaration or some other exception to the hearsay rule. It is a statement, I got into an alleys and I was impeded. And I just don't know how to get around it. So, why don't we just move to the question of, does it matter that it was hearsay? If it's hearsay, you know, you've got some courts that say that's a problem and some courts that say it isn't a problem. But the federal rules that the other side points to indicate that they are to prevail in all federal proceedings unless there's an exception. And there's no exception for Rule 23. So, why doesn't that, just like a plain language look, at the federal rules of evidence and the federal rules of civil procedure end the matter? So, I don't think the court needs to resolve that question today because I think the rest of what we have is more than enough to show numerosity. We're asking you to help us resolve it though. Can you answer that question? So, the question is why shouldn't the federal rules of evidence apply at the Rule 23 stage essentially? I would argue that because the judge is at classification just trying to ascertain whether it's a unitary, unified claim. So, that when we start moving forward, can we resolve this fairly in one proceeding or not? So, we don't need to resolve all the merits questions. We can see what the evidence is that is out there. We don't need to admit it. Well, that might be a laudatory goal, but I'm asking you a rules-based question, and the rules say what they say. Is there something in the rules themselves that would give you an outer deacknowledge that the rules on their face wouldn't permit it? I don't have an answer that says here's a source other than some cases like the Ninth Circuit that says the rules should not apply at Rule 23. I don't have that. I mean, I think more conceptually it's is this really an admission of evidence circumstance or is this just the judge taking a look at what is the nature of our case? And, of course, they need to look at some evidence to do that. I don't think it should have to be formal evidence other than perhaps what has been established, such as in expert testimony and the reliability standard. I see my time is up. Are there any other questions? Actually, just one, if my colleagues will permit me. There was something that the district court said that I wanted to ask about specifically. On page 14 of the district court's opinion, the judge says, if all these policies and procedures do, in fact, cause access barriers to unlawfully restrict individuals with disabilities from obtaining their desired goods, then the proposed members who endured violations have suffered the same injury. Now, that looked to me like a tautology because it says, if, in fact, their access barriers do unlawfully restrict individuals and it feels like the rabbit goes into the hat with the word unlawfully. Can you help me understand, and this, I guess, takes us back to the commonality point, how it is that we can say, look, there's a restriction here that constitutes an ADA violation based on all the things that we've just been talking about. When Mr. Eder puts before us, there are alternative ways to meet the needs of people with mobility disabilities that do not involve wide aisles. It is lawful to have a policy like, yes, I can, and that serves. In other words, this unlawfully restrict part is the problem I'm having. Can you help me with that? I think common evidence will still be used to determine whether any of their defenses are meritorious or not because those types of defenses like, you know, did we, I guess, offer alternative methods to get to the merchandise in such a way that there was never really an accessible barrier in the first place? That's operating on all aids. The evidence we need to have that out in the district court is going to be based on all aids. It's not going to be based on class member by class member. It's going to be based on what does all aids do? What is the evidence of how they do that? And was that enough to eliminate any inaccessibility? I think that's still a common question because, like I said, it operates as to all aids, not individual people. I had a question about your statistical evidence. I think you conceded that the number of people with serious mobility disabilities is about an order of magnitude higher than people who use wheelchairs. Why doesn't, but you didn't give any precise numbers, though, so why doesn't that make the data unreliable? Because the numbers are still so large. The ultimate question is, is joint or impractical? And I think everything in front of the court, and a lot of it is pretty good evidence, pretty reliable evidence. We know that it's millions and millions of people nationwide that use wheelchairs. No one in this courtroom would dispute that. That's impractical joint. We can't join all those people in one case. They're spread across the country. And the makeup of the class is changing every day. I mean, some people become disabled for the first time every day. Some people who are disabled pass away and are no longer in the class. It's sort of always in flux. And in this type of case, a Rule 23b-2 class, you never really need to get a fixed number of people. You don't need to know exactly how large it is, as long as it's too large to practically join. That's what the rule requires, and we have that here. Okay, thank you very much, Mr. Edsel. Mr. Edsel, we'll hear your rebuttal. Thank you, Your Honor. Plaintiffs argue that they can meet their burden under Rule 23a-2 based on a plausibility standard, but this mere pleading standard has been rejected by this court. So that's one of the issues we raise, and I think that's one of the problems with the district court's decision. That's exactly what they did. They applied a mere pleading standard. As to the temporary nature, counsel tried to explain that it's very limited. However, as cited in our brief, the preamble to Title III's implementing regulations at 73 Federal Register 34-508 state that it's not a violation of Title III to place boxes, potted plants, display racks, or other items, such that they cause pathways to be inaccessible to people who use wheelchairs, provided they are placed there temporarily. Okay, well, then answer Mr. Edsel's statement that the definition of temporary within this context is not can you move it. It is what's the purpose for which it's there, and if it's there because you're doing a transfer of goods for sale or something, that's okay, but if it's a sale display, that's not considered temporary. Is that accurate or inaccurate? I'd say it's inaccurate based on the very language that I just read to you. What purpose would a potted plant have to be placed in an aisle blocking it? It's obviously not there for maintenance or loading anything up. It's located there. And so the idea being that if someone raises an accessibility issue, it's quite easy to fix, and we can do it on the spot, which is what the yes, I can policy does here. Does that answer the point, though, that the visual store policy is, it doesn't say, oh, you know, if you mistakenly put a plant someplace, you should move it. It says it encourages things that will narrow the aisles. It actively suggests you should put stuff out into the aisles and do it in a way that will impinge on the aisle width. Again, getting back to the analogy of the hoe hider, if that does not prevent someone with a disability from being able to access a product or service, it's an irrelevant fact that the aisle's been narrowed. So really, is it then the case that if all these wanted to, it could make all its aisles like one foot across and then just say, hey, if you've got a wheelchair, just ask at the front desk? From the legal perspective, I'd say that it is. Now, you'd be, like a hoe hider said, you'd be at extreme risk that in every store, someone's going to come in and say you're not removing that quickly enough because you certainly can't address every aisle. I mean, as a practical matter, it's infeasible that they're going to be able to remove those barriers in a moment's notice. Your suggestion is that you would never have to move it, right? Am I understanding your position right, which is you could have permanently one foot across aisles and you could just say to the customers, hey, if you can't get down that aisle, tell us, we'll run down and get it for you. I think that is what the law says, and that's what the Mielo decision says. There's no affirmative obligation to seek out a barrier that might become an architectural barrier and therefore covered. Until it does, it's not a violation. Don't fight the hypothetical. My hypothetical is not seeking it out. My hypothetical is always makes a decision. It makes its aisles a foot across. It's clear you can't get a wheelchair down them, but they're willing to go pick something off the shelf for people. And I'm trying to understand, is it the legal position you're putting before us that that just doesn't matter as long as somebody will go get it for them? It absolutely is. The Department of Justice guidance says that an architectural barrier is a fixed physical object that prevents somebody from being able to access. So until you have that part, that's part of the definition. So until you have that, we use the phrase access barrier, but the term is really architectural barrier. So you don't have an architectural barrier until there is somebody prevented from accessing a good or service. How is it equal access in that hypothetical for someone not to be able to go to the location and as all other non-disabled customers to be able to scan the different options, to make choices on the spot? The legislative history, as we again cite in the brief, I don't have the citation right in front of me, the committee specifically states with respect to this section, the removal of barrier section, that it is not intended to require stores, and they specifically say department stores, to move their various fixtures and displays such that wheelchair users can get every product on their own. It's enough that they can get into the general department or area and see generally what the store has, and if needed, they can get assistance for somebody to get this specific product. So again, I'm answering from the legal perspective, but as a practical matter, if you had every aisle one foot, that's going to ultimately be an issue. I mean, it's not until it prevents somebody from accessing, because equal access means somebody has to be denied access. So again, if a tree falls in the woods and no one hears it, well, if there's an access barrier, but no disabled person ever comes across it, is it really an access barrier? Can I go back for one second to the issue of the rules of evidence and their applicability here? Because going back to fundamentals, when we, you know, think about the issues of commonality, we're really looking at the – and numerosity. We're really looking at the – an option to joinder for class members who otherwise would be moving to join in, you know, in an action. And in the joinder context, we – it's sufficient for someone to allege that they fit the definition of the plaintiff or share in that injury and that it's a common injury. We don't require proof to the standard of admissibility under the federal rules of evidence for purposes of joinder. And if what we're to look at in the question of numerosity and commonality is essentially that, why should we be applying the rules or assume that they set the same standard as admissibility at trial? And I don't know the rationale behind the court's decision and necessarily the BMW case. But there, as in this issue under 23A1, you have to present evidence, actual evidence, that somebody – that there's sufficient people who meet the class definition. I assume it's because of the protection of how onerous the class action process is, is that you actually need more safeguards than simple adjoinder of one or two parties. And so I imagine that's the basis. But relying on that case, the BMW case, it says that you have to put forth evidence that there's sufficient numbers who meet the class definition. And again, they are the designers of the class definition here. And so they simply have failed to put forth that evidence. Okay. Thank you. All right. Thank you, Mr. Etter.  Thank you, Mr. Etzel. We've got the matter under advisement. We'll call the next case.